UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EAST MAINE BAPTIST CHURCH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 4:05-CV-962 CAS |
| ) | |
| UNION PLANTERS BANK, N.A., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on defendant Regions Bank's ("the Bank") Motion for Summary Judgment on Counts I, II, III, X, and XIV Based on the Statute of Limitations. Plaintiffs have opposed the motion and defendant has replied. The Court will deny the motion for the reasons set forth below.

**I.    BACKGROUND**

Plaintiffs bring this action on behalf of a class of individuals who purchased bonds from Arch Leasing Corporation Trust ("ALCT") from May 1995 through November 1995. The bond proceeds were to pay for part of the price of computers that were then leased to other companies. These leases would generate revenue that would be used to repay the bank debt and some interest. After three years of paying interest, the principal of the bonds was to be paid in full with money from the residual value of the computers.

Under the Indenture, the Bank served as the indenture trustee for the Trust. One of the duties of the Bank, as indenture trustee, was to issue monthly interest checks to bondholders. Plaintiffs allege that as early as May 1995, the trust was in default because it was misapplying bond proceeds

to the operational costs of a third party, St. Louis Leasing Corporation ("SLC"). Plaintiffs allege that by 1995, the Bank had breached its contractual obligations to the bondholders by not declaring a default. Further, plaintiffs allege that the Trust's annual financial statements through March 31, 1996, indicate that more than $800,000 had been wrongfully removed from the Trust during the preceding year. The Bank did not declare a default until June 1998.

On January 2, 1996, SLC filed for bankruptcy. On behalf of the ALCT bondholders, the Bank filed a claim against SLC in the bankruptcy proceedings seeking imposition of a constructive trust. On July 25, 1996, during these bankruptcy proceedings, SLC filed a First Amended Disclosure Statement in which it publicly admitted that some of the proceeds of the bonds in its possession were not used for trust purposes. On August 2, 1996, the bankruptcy court approved the settlement of the claims on behalf of the ALCT bondholders against SLC for payment of $1,425,000.

The relevant dates of the conduct at issue in Counts I, II, III, X, and XIV are set forth in the following chart:

| COUNT | DATE OF CONDUCT |
|---|---|
| I | May 1995 through July 1995 |
| II | July 1995 through November 1995 |
| III | November 1995 |
| X | Before March 31, 1996 |
| XIV | November 1995 |

Plaintiffs' counsel filed this action on November 12, 1999. The Indenture provides that it "shall be construed in accordance with the laws of the State of Delaware, without reference to a conflict of laws provisions and the obligations, rights and remedies of the parties shall be determined

in accordance with such laws." Delaware law provides for a three-year statute of limitations for claims arising out of contracts.

## II.  DISCUSSION

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, illustrates that no genuine issue of fact exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether the moving party has met its burden, all evidence and inferences are to be viewed in the light most favorable to the non-moving party. Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir. 1990).

### A.  **The Applicable Statute of Limitations for Counts I and X**

The Bank argues that Delaware's three-year statute of limitations for actions based on contracts or fiduciary relations applies to Counts I, II, III, X, and XIV of plaintiffs' Third Amended Petition. See 10 Del. Code. Ann. § 8106. Plaintiffs assert that Counts I and X implicate the Bank's Servicing Agreement. Because Missouri law governs the obligations, rights and remedies of the parties under the Servicing Agreement, plaintiffs contend that Missouri law applies to these counts.

3

Plaintiffs claim that the Bank has not shown it is entitled to summary judgment on those Counts partially arising under the Servicing Agreement.[1]

The Servicing Agreement was entered April 13, 1995 by and among ALCT, SLC, and Arch Leasing Corporation. The agreement sets out the terms of these parties' agreement to purchase and lease computer equipment to various entities. Specifically, ALCT leased computers to entities marketed by the lease broker, SLC. ALCT also issued bonds to investors to finance the computers and the leases. Arch Leasing Corporation provided servicing and administration services to ALCT. The Bank was not a party to the Servicing Agreement. Rather, in its capacity as the indenture trustee, the Bank acknowledged and accepted the Servicing Agreement by signing the agreement "acknowledged and accepted."

Count I does not implicate the Servicing Agreement. It alleges that the Bank violated certain provisions of the Indenture. The Court is not persuaded by plaintiffs' argument that the Indenture incorporates the Servicing Agreement such that the choice of law provision of the Servicing Agreement controls for purposes of Count I. Plaintiffs have not cited any provision of the Indenture that expressly incorporates the Servicing Agreement. The Indenture does not, by defining "basic documents" to include the Servicing Agreement, incorporate the choice of law provisions of the Servicing Agreement. Regardless, plaintiffs in Count I have claimed violations of express provisions of the Indenture that do not relate to the Servicing Agreement. The Court finds that Count I for

---

[1] Plaintiffs present their argument in three sentences in footnote 1 of their response to summary judgment, the crux of which is as follows: "Plaintiffs asserted claims implicating the Bank's Servicing Agreement. Plaintiffs maintain that Missouri law controls . . . under the Servicing Agreement." In their Statement of Material Facts as to Which a Genuine Issue Exists, plaintiffs expand slightly upon their argument, stating "Counts I and X of the Plaintiffs' Third Amended Complaint are based, in part, upon the Servicing Agreement . . . ."

violation of the Indenture relating to improper use of bond proceeds is governed by the choice of law provision of the Indenture, which provides for Delaware law to apply.

In Count X, plaintiffs allege that the Bank breached the Indenture and the Servicing Agreement in connection with the alleged conversion of the trust funds. Plaintiffs allege that by allowing defendant Chlebowski to withdraw $800,000 from the trust to use for his own purposes, the Bank violated sections 5.01 and 5.02 of the Servicing Agreement, which provide in part:

> (ii) With respect to the Trust Account Property, *[the Bank] agrees, by its acceptance hereof, that*:
>
> > (A) any Trust Account Property that is held in deposit accounts shall be held solely in the Eligible Deposit Accounts; and each such Eligible Deposit Account shall be subject to the exclusive custody and control of [the Bank], and [the Bank] shall have sole signature authority with respect thereto;

Servicing Agreement, § 5.02 (emphasis added); see also Third Am. Pet. ¶¶ 132-33.

Although the Bank is correct in asserting that it was not a party to the Servicing Agreement, based on the terms of the Servicing Agreement, by simply "acknowledging and accepting" the Agreement, the Bank has agreed to certain provisions of the Agreement. See § 5.02 ("[the Bank] agrees, by its acceptance hereof, that . . ."). In Count X, plaintiffs seek damages arising out of section 5.02 of the Servicing Agreement, a provision to which the Bank "agreed" by its acknowledgment and acceptance of the Servicing Agreement. Id. Plaintiffs' claims arising out of the Servicing Agreement will be governed by Missouri law, not Delaware law. See Servicing Agreement, § 10.09. Therefore, to the extent Count X alleges that the Bank violated the Servicing Agreement, this allegation will be governed by Missouri's five-year statute of limitations for contract claims. See § 516.120 Mo. Rev. Stat. (2000). The conduct at issue in Count X occurred in early 1996, prior to March 31, 1996. Missouri's five-year statute of limitations for actions brought pursuant to the Servicing Agreement

5

did not run until March 31, 2001, after the filing of the instant action. Therefore, the Court will deny the Bank's motion for summary judgment as to Count X.

### B. Delaware's Three-Year Statute of Limitations Bars Counts I, II, III, and XIV Absent a Valid Tolling Argument

In Counts I, II, III, and XIV, plaintiffs assert breach of contract claims against the Bank based on conduct occurring in May 1995 through November 1995 related to the issuance or authentication of bonds. Each of these counts alleges breach of a contractual obligation under the Indenture. The Indenture specifies that Delaware law applies to all claims arising out of the Indenture.

Under Delaware law, the statute of limitations for breach of contract claims is three years. See 10 Del. Code Ann. § 8106. The three-year limitations period of the Delaware statute begins to run when the cause of action accrues, which for breach of contract claims is at the time of the breach. See Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 860 A.2d 312, 319 (Del. 2004); Nardo v. Guido DeAscanis & Sons, Inc., 254 A.2d 254, 256 (Del. Super. Ct. 1969). Plaintiffs' counsel filed the original petition in this case on November 11, 1999, more than three years after the last conduct in these Counts allegedly occurred. Because each of the claims alleged in Counts I, II, III, and XIV are based on wrongful acts occurring before November 11, 1996, these claims are time-barred. Therefore, to save these claims, plaintiffs must assert a valid tolling argument to toll the running of the statute of limitations.

### C. Plaintiffs' Tolling Arguments

Plaintiffs allege that Counts I, II, III, and XIV are timely because the statute of limitations was tolled until the Bank declared a default on the Indenture in 1998. Plaintiffs assert three different theories to support the tolling of the statute of limitations: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. As the party asserting the tolling doctrine, plaintiffs

6

bear the burden of proof and must plead specific facts to demonstrate that the statute of limitations was tolled. Pomeranz v. Museum Partners, L.P., 2005 WL 217039, *1 (Del. Ch. Jan. 24, 2005). Under each of the three tolling theories asserted, the statute of limitations is tolled only until the plaintiffs discovered, or exercising reasonable diligence should have discovered, their injury, i.e., when the plaintiffs are in inquiry notice. Inquiry notice does not require full knowledge of the material facts. Rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence would start an investigation that would lead to the discovery of the injury. In re Dean Witter P'ship Litig., 1998 WL 442456, *6 n.43 (Del. Ch. Jul. 17, 1998) (discussing the statute of limitations from the point of inquiry under each of the three tolling theories).

### 1. *Fraudulent Concealment*

As its name suggests, the doctrine of fraudulent concealment requires the defendant to be engaged in affirmative acts of fraudulent concealment of the facts necessary to put the plaintiff on notice of the injury. To prevail on this theory, the plaintiff must prove that the defendant knowingly acted to prevent plaintiff from learning facts or misrepresented facts intending to "put the plaintiff off the trail of inquiry." State ex rel. Brady v. Pettinaro Enters., 870 A.2d 513, 531 (Del. Ch. 2005). "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to the operation of the statute [of limitations]." Dean Witter, 1998 WL 442456 at *5 (quoting Halpern v. Barran, 313 A.2d 139, 143 (Del. Ch. 1973)). Additionally, mere silence is insufficient to establish fraudulent concealment. Rather, the evidence must show that the defendant engaged in "actual artifice" to toll the running of the statute of limitations. See Truitt v. Beebe Hosp. of Sussex County, Inc., 514 A.2d 1128, 1131 (Del. Super. Ct. 1986). Plaintiffs do not allege or argue that the

7

Bank engaged in any affirmative acts of fraudulent concealment. Plaintiffs cannot, therefore, rely on this tolling theory to stop the running of the statute of limitations on Counts I, II, III, and XIV.

### 2. *Equitable Tolling*

Similarly, plaintiffs have failed to meet their burden of showing that the doctrine of equitable tolling applies to their claims. Under the theory of equitable tolling, the running of the statute of limitations is tolled for claims of wrongful self-dealing where a plaintiff reasonably relies on the competence and good faith of a fiduciary. See Dean Witter, 1998 WL 442456 at *6; Carlton Inv. v. TLC Beatrice Int'l Holdings, Inc., 1995 WL 694397 (Del. Ch. Nov. 21 1995); Litman v. Prudential-Bache Properties, Inc., 1994 WL 30529, *3 (Del. Ch. Jan. 14, 1994) ("[T]he better rule . . . is that a limitations period may be tolled absent allegations of affirmative acts of concealment by the defendants, where the parties to the litigation stand in a fiduciary relationship to each other *and* where the plaintiff alleges self-dealing.") (emphasis in original). Plaintiffs have not alleged that the Bank engaged in any self-dealing. Therefore, the doctrine of equitable tolling cannot operate to toll the running of the limitations period for Counts I, II, III, and XIV.

### 3. *Inherently Unknowable*

Under the "inherently unknowable" tolling doctrine, the statute of limitations is tolled during the time in which the discovery of the cause of action is a practical impossibility. Plaintiffs must show that there were no observable or objective factors to put them on notice of an injury, and must show that they were blamelessly ignorant of the act or omission and the injury. See Dean Witter, 1998 WL 442456, at *5; Seidel v. Lee, 954 F. Supp. 810, 816-17 (D. Del. 1996). If plaintiffs can meet their burden of pleading specific facts to demonstrate that the statute of limitations was tolled, they then

8

must convince the Court that they were not on inquiry notice of their claims more than three years before filing their petition.

### *(a)* *Observable or Objective Factors*

As the Bank notes, plaintiffs overlook the threshold requirement of asserting that there were no observable or objective factors that put them on notice of an injury. Plaintiffs simply argue that they were not on inquiry notice of their claims prior to three years before filing suit. As a practical matter, however, the first prong of the "inherently unknowable" doctrine mirrors the inquiry notice requirement. By meeting the requirement that they show they were not on inquiry notice, plaintiffs meet the requirement that they assert there were no observable or objective factors to put them on notice. Regardless of the label attached to this inquiry, plaintiffs bear the burden of demonstrating that they were not on notice of an injury prior to three years before bringing suit.

In its motion for summary judgment, the Bank asserts that observable or objective factors put plaintiffs on notice of their injury and its causes. Specifically, the Bank points to the Form 10-Q filed with the SEC by ALCT in early 1996 as providing notice that SLC had diverted funds from the Trust. The Bank also states that ALCT filed annual reports that should have put plaintiffs on notice of an injury. Neither the Bank nor plaintiffs attached the Form 10-Q or ALCT's annual reports to their filings. The Bank's citation refers the Court to paragraphs 117-120 of plaintiffs' Third Amended Petition. These paragraphs do not mention a Form 10-Q, but rather state that ALCT's financial statements from 1996 reflect that $800,000 had been removed from the Trust. Plaintiffs allege in their Third Amended Petition: "On information and belief, defendant Chlebowski withdrew from the ALCT cash or other liquid assets in excess of $800,000, and converted it to his own use." (3d Am. Pet. ¶ 120).

9

The Court could not find support for the Bank's argument that "plaintiffs claim [the] Bank breached the provisions of the Indenture and related documents because it could have examined publicly available finance statements filed by the Trust with the SEC (Forms 10-Q) in early 1996, and thus, it should have been aware that SLC diverted funds from the Trust." (Bank Mem. at 6). At most, based on the financial statements, plaintiffs can establish that $800,000 was removed from the Trust. Plaintiffs' allegation that Chlebowski wrongfully withdrew this money is based only upon information and belief. See Third Am. Pet. at ¶ 120. Neither the financial statements nor plaintiffs' allegations in the petition support the Bank's assertion that plaintiffs were on inquiry notice of their injury in 1996.

Additionally, the Bank asserts that undisputed facts show plaintiffs were aware of their injury during SLC's 1996 bankruptcy proceedings. On June 25, 1996, during these proceedings, SLC filed a disclosure statement in which it admitted that some of the bond proceeds were used for its own purposes. Section 5.13(d)-(e) of SLC's Disclosure Statement filed in the bankruptcy court states as follows:

> (d) On behalf of the ALC Trust and as the Indenture Trustee . . . [the Bank] has asserted a constructive trust/equitable lien claim against the Debtor's [SLC's] estate for all bond proceeds which were not used to purchase computer equipment to be leased to third-party lessees.
>
> (e) . . . The Debtor [SLC] received the bond proceeds from the ALC Trust, but failed to procure leases for the benefit of the ALC Trust as it was obligated to do. The Debtor admits that it has in its possession the bond proceeds which it received from the ALC Trust, recognizes that its balance sheet is inflated by the amount of the bond proceeds received from the ALC Trust not actually used to procure exiting ALC Trust leases and agrees that the ALC Trust's funds are in its possession.

The Bank contends that these public documents and proceedings placed plaintiffs on inquiry notice of their claims.

Plaintiffs respond that because of the unique position of the Bank as their fiduciary, they were entitled to rely upon the Bank to give them notice of ALCT's default under the Indenture. Absent such notice of default from the Bank, plaintiffs contend that they should not be deemed to have had notice of any claim. Therefore, plaintiffs state that they did not receive notice of any potential claim sufficient to put them on inquiry notice until February 28, 1997, the date the Bank sent notice referencing the SLC bankruptcy proceedings, or alternatively, June 11, 1998, when the Bank first declared by written notice the event of default under the Indenture. Plaintiffs use these alternative dates as the accrual dates of their claim, and state that the filing of this action on November 12, 1999 occurred within the three-year statute of limitations period. Plaintiffs rely on Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 WL 694397 (Del. Ch. 1995), for their assertion that they were entitled to rely on the Bank as a fiduciary to give them notice.

In Carlton, plaintiff employed the doctrine of equitable tolling, which requires proof of self-dealing by a fiduciary. See Part II.C.2, *supra*. Unlike the instant case, the Carlton plaintiff had alleged self-dealing by corporate fiduciaries. The court denied summary judgment because it found that a critical fact, i.e., whether plaintiff knew it could not rely on its fiduciary, was subject to dispute. Plaintiffs overlook a key difference between their case and the Carlton case, which is that Carlton involved a fiduciary engaged in self-dealing. In such an instance, the statute of limitations is tolled until plaintiffs have reason to know of the facts giving rise to the alleged wrong. The doctrine of equitable tolling, like the doctrine of fraudulent concealment, rests on the premise that defendants should not be permitted to use a limitations period as a shield when they have engaged in fraudulent acts that have denied plaintiffs the opportunity to discover the wrongdoing. Litman, 1994 WL 30529 at *3.

11

Here, in the absence of a self-dealing fiduciary and any act of affirmative concealment, plaintiffs attempt to rely on Carlton to relieve them of their duty to investigate facts that would lead to the discovery of their injury. "[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings." Seidel, 954 F. Supp. at 817. Plaintiffs' position would allow any beneficiary of a fiduciary duty to rely on the fiduciary to disclose the injury, regardless of whether the fiduciary was attempting to conceal the injury or was engaged in self-dealing. In the instant case, however, because the Bank was not engaged in self-dealing, the doctrine of equitable tolling is not applicable. See Litman, 1994 WL 30529 at *3 (holding that tolling requires affirmative act of fraud by defendants or a fiduciary relationship in which plaintiff alleges self-dealing). The statute of limitations will only be tolled until such time as plaintiffs knew or should have known of their alleged injury. Dean Witter, 1998 WL 442456 at *6. Therefore, the critical question is when plaintiffs had sufficient knowledge to raise their suspicions to the point where a person of ordinary intelligence would start an investigation that would lead to the discovery of the injury.

The Bank contends that the disclosures made during SLC's bankruptcy proceedings were sufficient, as a matter of law, to put plaintiffs on inquiry notice of a potential claim that the Bank had violated the Indenture. Inquiry notice does not require actual discovery of the reason for the inquiry. Nor does it require awareness of all aspects of the wrongful conduct. "Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme." Dean Witter, 1998 WL 442456 at *7.

Although SLC's Disclosure Statement filed in its bankruptcy proceeding reveals the general scheme of wrongful conduct, the Court finds that SLC's Disclosure Statement does not constitute

a public document that can be deemed to have placed plaintiffs on inquiry notice. Delaware courts have held that public documents such as annual and quarterly reports, proxy statements, and SEC filings may provide plaintiffs with adequate notice of defendant company's alleged misconduct. See Seidel, 954 F. Supp. at 817. This Court finds no support for the Bank's argument that a disclosure statement filed by a third-party debtor in its bankruptcy proceeding is the type of public document that can, as a matter of law, be deemed to have placed plaintiffs on inquiry notice.

The Bank further states that several named plaintiffs had actual notice of the diverted funds. A trustee for named plaintiff East Maine Baptist Church (Stanley Keyes), the owner of named plaintiff Commercial Mortgage (Betty Hogfeldt), and named plaintiff Susan Duever were investors in Arch Funds. The Bank sent a notice of the SLC bankruptcy to these named plaintiffs in January 1996. Also, the Bank states that Mr. Keyes and Ms. Duever were named as creditors of SLC and filed proofs of claim in the bankruptcy proceedings, and Mr. Keyes was a member of the creditors' committee. Although it is not entirely clear from its memoranda, the Bank apparently relies on these facts to establish that the particular named plaintiffs had actual knowledge of the diverted funds through their participation in SLC's bankruptcy proceedings.

To the extent any plaintiff received actual notice of the wrongful conduct prior to November 12, 1996, that plaintiff's claim would be barred by the statute of limitations. From the present record, the Court cannot determine whether any plaintiff had actual notice of the wrongful conduct prior to November 12, 1996. Although plaintiffs Commercial Mortgage (through Betty Hogfeldt) and Susan Duever were aware of SLC's bankruptcy and Duever filed a proof of claim, the Court has rejected the argument that disclosures made during SLC's bankruptcy proceedings were sufficient, as a matter of law, to put plaintiffs on inquiry notice of a potential claim that the Bank had violated the Indenture.

13

The Bank's assertion that Duever knew in 1996 that a claim had been made that SLC diverted assets from the Trust (see Bank's Statement of Facts ¶ 39) is not supported by the record. Duever's deposition testimony is equivocal and appears to be that she was not certain when she learned of the diversion, but she believed it was in 1999.

The Bank asserts that the trustee of plaintiff East Maine Baptist Church, Mr. Keyes, was a member of the Unsecured Creditors' Committee in SLC's bankruptcy and was mentioned by name in SLC's Disclosure Statement. Although Mr. Keyes' status as a member of the Unsecured Creditors' Committee might tend to prove his actual notice prior to November 12, 1996 that SLC diverted asserts, the current record before the Court does not permit the Court to find that Mr. Keyes had such notice.[2] ALCT's claim in the SLC bankruptcy appears to have been a secured claim. See

---

[2] The Bank asserts in its Statement of Fact ¶ 38 that Mr. Keyes was a trustee of East Maine Baptist Church and was a member of the Unsecured Creditors' Committee in SLC's bankruptcy proceeding. The deposition transcript of Mr. Bob Rossman (Bank Ex. F) supports the fact that Mr. Keyes was a trustee of East Maine Baptist Church. SLC's Disclosure Statement (Bank Ex. G) appears to support the fact that Mr. Keyes was a member of the creditors' committee. In response to Statement of Fact No. 38, however, plaintiffs deny that Mr. Keyes was a member of the unsecured creditors' committee on the basis that Exhibit G is not a properly authenticated or certified copy of a purported court document.

The Bank replies that (1) Betty Hogfeldt identified the SLC Disclosure Statement in her deposition testimony and testified that she was producing it from her files, and (2) the Court may take judicial notice of the Disclosure Statement on the basis that it is a "readily verifiable court document." Bank Reply at 10, n.5. In support, the Bank cites 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 2722-23 (3d ed. 1998), and Kern v. Tri-State Insurance Co., 386 F.2d 754, 755 (8th Cir. 1968).

"To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents which do not meet those requirements cannot be considered." Stuart v. General Motors Corp., 217 F.3d 621, 635 n.20 (8th Cir. 2000).

Ms. Hogfeldt testified that she "would imagine" she received the SLC Disclosure Statement from the bankruptcy court, but also stated, "It's been so long ago I don't know." Hogfeldt Dep.

Disclosure Statement at 36, ¶ 5.13. The Bank has not presented any evidence or argument to establish that Mr. Keyes' status as a member of the seven-member Unsecured Creditors' Committee gave him inquiry notice of ALCT's secured claim that there had been a diversion of funds.

The Court concludes that material issues of fact exist concerning Mr. Keyes' actual notice of wrongdoing prior to November 12, 1996. Where the tolling of the statute of limitations turns on controverted issues of fact, dismissal of the claim would be inappropriate. See, e.g., In re Asbestos Litig., 673 A.2d 159, 163 (Del. Super. Ct. 1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate).

### (b) *Blamelessly ignorant of act or omission*

The second requirement under the "inherently unknowable" doctrine is that plaintiffs are blamelessly ignorant of the act or omission and the injury. Plaintiffs may establish this ignorance by showing justifiable reliance on a person who they have no reason to suspect of deception. See Smith

---

80:5-13. Ms. Hogfeldt conceded that the Disclosure Statement came out of the papers she brought to her deposition, but also stated confusingly, "I had it in that same envelope, yeah. It can't have anything to do with this other, because I don't keep that at home." Id. at 80:14-19. The treatise on which the Bank relies states, "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A Wright, Miller & Kane, *supra*, § 2722. The Court concludes that Ms. Hogfeldt's testimony cannot serve to authenticate Exhibit G as an official court document.

The Eighth Circuit has noted that courts "may take judicial notice of judicial opinions and public records." Stutzka v. McCarville, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (taking judicial notice of an unpublished bankruptcy order of default judgment). The records of the United States Bankruptcy Court for the Eastern District of Missouri are public records and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 933 (8th Cir. 2004) (quoting Fed. R. Evid. 201(b)). The Court will therefore take judicial notice of the SLC Disclosure Statement.

v. McGee, 2006 WL 3000363, *3 (Del. Ch. Oct. 16, 2006) (citing Dean Witter, 1998 WL 442456 at *5).

Plaintiffs assert that they justifiably relied on the Bank to act pursuant to its fiduciary duty to alert them to any acts by the Trust in derogation of the Indenture. The Bank concedes its "limited" fiduciary status, but states that plaintiffs were on notice of the wrongful conduct because of the notice issues discussed above, and therefore plaintiffs "obscure the issue of how much reliance they were allowed to place upon the alleged fiduciary relationship." Bank Reply at 6.

The Court rejects the Bank's contention for the reasons discussed in Part II.C.3(a), *supra*.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that Regions Bank's Motion for Summary Judgment on Counts I, II, III, X, and XIV Based on the Statute of Limitations should be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Regions Bank's Motion for Summary Judgment on Counts I, II, III, X, and XIV Based on the Statute of Limitations is **DENIED**. [Doc. 50]

*[signature]*

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  26th  day of March, 2007.